## LEE CENTELL v. STATE.

No. A-7070.  Opinion Filed Jan. 17, 1930.
(287 Pac. 429.)

See, also, 38 Okla. Cr. 127, 259 Pac. 276.

Sherman & Warren and C. H. Baskin, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

EDWARDS, P. J.   The plaintiff in error, hereinafter called defendant, was convicted in the district court of Pottawatomie county on a charge of murder, and was sentenced to life imprisonment in the state penitentiary.

Defendant and one T. L. Ellard were jointly charged with the murder of L. S. (or Ellis) Baker.   Ellard was driving the car in which defendant and Hull went to and from the place of the killing, and one Delmar Hull killed Baker by stabbing him seven times with a knife.   All the parties were oil field workers.   The killing occurred in the town of Earlsboro, at the house of a Mrs. Johnson. The testimony of defendant and his witnesses indicates that this place was a whisky joint and bawdy house, and that they went there to procure whisky.   Mrs. Johnson had been doing laundry work for Baker, the deceased, for some time, and he went there on this occasion for the purpose of getting his laundry.   He went into the kitchen to wait and was not in the front room or on the porch where the women were.   Delmar Hull, who was with defendant and Ellard, was intoxicated to some extent.   He went into the kitchen where Baker was, and soon a difficulty arose.   A young son of Mrs. Johnson and two women, a Miss Williams and a Miss Carlton, who were on the front porch, started into the kitchen.   Defendant was at the door leading from the front room into the kitchen, and put his hands on the side of the door and refused to

let. any one enter, and just at this time Hull struck deceased in the stomach with a chair. Defendant testified that his motive in keeping others out of the kitchen was to see that Baker and Hull had a fair fight, although at the time he saw Hull had the chair raised to strike Baker. The theory of the state is that defendant aided, assisted, and abetted Hull in the actual killing. The theory of defendant, as just stated, is that he was atempting to see that there was a fair fight between Baker and Hull, or that he was acting as a peacemaker. A square conflict is thus presented. From the rather voluminous record, we quote a few brief excerpts. Daisy William, who lived at the Johnson place, in part testified:

"* * * Q. After you turned around and went out on the porch you say Baker came running around the house? A. Yes, sir, about a minute after that.

"Q. Did you see Centell and Hull about that time, or later? A. Yes, as he came around the house Lee Centell was right after him, right behind him.

"Q. What was Centell doing, was he running? A. Yes, he as running.

"Q. After Baker, the dead man? A. Yes, sir. * * *

"Q. Just tell exactly what those three men did? A. Well, after I left the house and walked onto the porch, in a few minutes, maybe a minute, Baker came running around the house, Lee Centell following him, and the car was parked out in front of the house in the road, with the motor running.

"Q. And Ellard sitting in the car? A. Yes, sir. Just as he started around the car, Lee Centell hit him—he got even with the car and hit him and knocked him against the car.

"Q. How? A. With his fist.

"Q. Where? A. Right in here (indicating) I think, about the head and knocked him against the car, and then he grabbed him around the neck—Lee Centell grabbing him around the neck and was holding him and hitting him.

"Q. How did he grab him? A. Around the neck like this (indicating) some way, with his arm, and was hitting him in the face and Delmar Hull ran around the house and said 'I will kill him,' and stabbed him 4 or 5 or 6 or 7 or 8 times—4 times before they even started the car off, and he ran around and got in the left side of the car and Lee Centell got in on this side and tried to pull Baker into the car, but couldn't. * * *

"Q. After Hull stabbed Baker what was Lee Centell doing? A. Still holding him.

"Q. Did he turn Baker loose at all? A. No, sir.

"Q. Now, what did Centell do to or with Baker after Hull stabbed him? A. He go into the car and tried to pull him into the car and couldn't, but he was still holding him and dragged Baker on the running-board, and he drove north a block.

"Q. What was Baker's condition at that time as to whether he was disabled in any way? A. Yes, sir, he was.

"Q. He was disabled and Centell dragged him on the running-board? * * *

"Q. Was anything said there by any of them during that time you remember hearing? A. Baker said, 'Please don't kill me.' * * *"

Hettie Carlton testified:

"* * * Q. What racket did you hear? A. A rumbling of some kind. I didn't know what it was until I went to the middle door between the kitchen and living room. * * *

"Q. Where was Centell? A. He was in the middle door, standing in the middle door. * * *

"Q. Tell the jury what happened there you observed? A. I started through the door, and he was standing in the door and he wouldn't let me through.

"Q. What did he do? A. When he met me a second time he hit me and knocked me back.

"Q. How did he hit you and how did he knock you back? With what? A. Just his hand, shoved me back against the wall. * * *

"Q. What did he say? A. He said he would knock my head off if I didn't stay back. * * *

"Q. Could you see into the room? A. Yes, sir, I saw under his arm.

"Q. What did you see? A. Well, I seen Hull hit Mr. Baker.

"Q. What with? A. With a chair, stool chair.

"Q. Where did he hit him; what part of his body? A. In the stomach. * * *

"Q. What was the next thing you observed? A. Mr. Baker coming around the side of the house.

"Q. How was he coming? A. He was just trotting along.

"Q. What was his appearance to you at that time? A. Well, he seemed to be kind of exhausted, kind of give-out as he came by me.

"Q. Did you see anybody else coming? A. Yes sir.

"Q. Around the house, who? A. Centell and Hull. * * *

"Q. Go ahead? A. And Centell ran onto him and hit him.

"Q. What did he hit him with? A. With his fist. * * *

"Q. Go ahead and tell what occurred? A. He hit him and knocked him towards the car, and the next I seen he

had his arm over Baker's head—had Baker's head under his arm and setting down backwards into the car seat on the right hand side.

"Q. You say he had his arm over Baker's head? A. Yes, sir.

"Q. Just tell the jury as nearly as you can how he had it? A. He had his head under his arm like this (indicating).

"Q. Had Baker's head under Centell's arm? A. Yes, sir. * * *

"Q. What else occurred then? Did you see Hull during that time? A. I wasn't looking at Hull at that time. He came by me though when Centell stepped backwards in the car, Hull came by me and I saw a knife flash.

"Q. Where was the knife? A. In Hull's hand.

"Q. Where did Hull go, and what did he do? A. He went by me and stabbed him. * * *

"Q. What was Baker doing at the time Hull stabbed him? A. He was standing on the ground with his head down.

"Q. Under Centell's arm, as you described? A. Yes, sir.

"Q. When the car started what happened to Baker and Centell and Hull? A. When the car started—well, the car was going so fast Mr. Baker's feet left the ground, and he caught with his knees on the running board and I seen Hull reach over Centell's shoulder with the knife.

"Q. What did he do? A. He stabbed him.

"Q. Stabbed who? A. Baker."

J. F. Vaught, a carpenter, who was working on a building across the street, testified:

"* * * Q. Just tell the jury what you observed with reference to this difficulty? A. Well, there was a fight started over there.

"Q. Over where? A. Over across that street by that house straight across that the store fronts. A couple of men fell out the back door in a scrimmage. * * *

"Q. What happened when they went out the back door? A. Well, there was a fellow came out right after them and he interfered in the fight.

"Q. What did he do? A. Well, sir, I think he kicked —the best I could see, he kicked this guy.

"Q. Kicked who? A. This man Baker, I believe his name was. He was on top, it looked like from where I sat in the scrimmage. * * *

"Q. Then, what occurred? A. This man got up off of him—Baker got up and this guy that did the kicking there hit him or cut him, I don't know which.

"Q. The man that kicked him? A. Yes sir.

"Q. What, if anything, then happened. A. They went out of my sight around the house. * * *

"Q. Did you later see them? A. Yes sir.

"Q. Then, tell the jury what you saw? A. Just saw a rough and tumble fight.

"Q. Just tell what you did next see? A. They just grabbed him.

"Q. Grabbed who? A. Grabbed this party, Baker.

"Q. Who grabbed him? A. I don't know; both of them, I reckon. * * *

"Q. What was done there then when they grabbed him? A. They looked to me like they was dragging him.

"Q. Who dragged him? A. Both of them, I suppose. They was in a bunch there together.

"Q. Where did they drag him to? A. Drug him to a car. * * *

"How fast did that car start up and move away from there? A. Why pretty good gait, pretty fast.

"Q. What went with the man whose feet were dragging as they went along? What happened to him? A. I think they carried him about a block and threw him off. * * *"

C. A. Oden, a tailor living in a house 20 or 30 feet from the Johnson house, testified:

"* * * Q. Go ahead and tell what you observed as you left the well? A. The fight was going on in the house when I was at the well. I don't know it was a fight, but I could hear blows and sounds. I couldn't say that it was, but I got my water and started back, and when I got about half way between my house and the old house I saw a man run into the front yard and whom I do not know.

"Q. Where did he come from? A. He came either from around the house or front door of the house, I don't know which.

"Q. You don't know which? A. No, sir. This man seemed to be in misery or something. He seemed to be knocked breathless. I couldn't explain his condition, but he was going towards town and I saw a good sized fellow —I don't know none of the men but this fellow seemed the way it looked he would weigh 200 pounds, ran up behind him and kicked him. Just after he kicked him he grabbed hold of him with what I call a Nelson grip.

"Q. What do you mean a Nelson grip? A. Well, I can show you. * * *

"Q. Tell what then happened, Mr. Oden? A. After the man got hold of him with his Nelson grip, whom was a good sized man, he shook him and he took hold of him in a very rough manner and drug him up to the car, and

then about that time a third man came along and assisted in placing the man on the fender of the car.

"Q. Did you see where this third man came from? A. He came with the rest of them, but, however, he was later getting out than the others.

"Q. Now what did the third man do when he came up? A. When he came up he took hold of Mr. ————, the man who got killed, whom they said was Mr. Baker— took hold of his right arm. After they placed him on the fender of the car then he hit him or stabbed him a time or two. I don't know whether he stabbed him or not. I did't see the knife.

"Q. Describe the kind of blow you saw dealt? A. The kind of blows I saw dealt at that time were just straight blows. * * * He laid him on the car, you see, fighting him at the same time, this big man—he seemed to be the biggest man in the crowd of the three. Then he places him—helped shove him towards the car, push him towards the car, and he ran around and got in from the other side, if I remember right, and reached over and stabbed again. I didn't see the knife.

"Q. Which one did that? A. I don't know.

"Q. Was it the big man or the other man you say stabbed him? , A. It wasn't the big man that done the hitting at that time.

"Q. Now, did you see the big man hit him at all? A. Yes, sir, I did. * * *

"Q. Then tell what occurred, what you heard or saw there? A. I only heard the man that got killed say 'give me my hat.' That is all I remember ever hearing the man say.

"Q. What else occurred that you saw. A. At that time the motor was moving west, or the car was moving west, and there was still blows being made as the car

moved on, and then when they got to the corner of the street this man was shoved off the running-board and he hollered once or twice and was dead when I got down there.

"Q. How fast did that car move down the street as they went away?   A. I couldn't say.

"Q. Well, about how fast, could you say about how fast it moved?   A. Well, I would estimate 18 miles an hour, or 20.

"Q. When the man fell off the car, how did he fall, in what position?   A. He didn't fall off the car, no sir.

"Q. How did he get off?   A. The big man shoved him off. * * *"

Other disinterested witnesses testified along the same line.   Even on defendant's own evidence it is difficult to see how an impartial jury could have concluded that he was attempting to see a fair fight between Baker and Hull, and that later in the difficulty he acted as a peacemaker. Defendant and Hull were friends.   They had gone to this place together.   Hull was drinking heavily and was a large and robust man.   It is evident that, after Hull had struck Baker with a chair and Baker fled in a weakened condition, both defendant and Hull pursued him, and that defendant struck him, then held him while Hull came up and stabbed him, and, after he was taken some distance, held by defendant on the running-board of the car, he was shoved or thrown to the ground and left to die.   The testimony for the state proves a cruel and vicious murder.   The case fully illustrates the wisdom of the rule that questions of fact are for the determination of the jury, who hear the witnesses and observe their demeanor on the stand, and are in a better position to weigh and determine conflicts of testimony and the credibility of witnesses than an appellate court, whose members, of course, do not have this

opportunity. There is an abundance of testimony to support the verdict of the jury, and from which they could reasonably and logically find that defendant aided, abetted, and assisted in the homicide.

It is also argued that the court erred in instruction No. 15. This instruction, in substance, tells the jury that, if they believe or have a reasonable doubt that deceased approached the car for the purpose of procuring a weapon with the intent to resume the difficulty with Hull, and believed or had a reasonable doubt that defendant in his acts was attempting to dispossess or prevent the deceased from procuring a weapon, or have a reasonable doubt that defendant knew that Hull was armed with or using a knife upon deceased, or if they had a reasonable doubt that defendant knowingly assisted Hull, then they should acquit him. This instruction is not well worded, but it does not place on defendant the burden of proving his defense. The killing is undisputed. It was also proven that defendant participated in the things which led up to and caused the death of deceased. Section 2719, Comp. Stat. 1921. The conflict is as to the extent of or purpose of his participation. The court here evidently was attempting to state to the jury defendant's theory and to tell them, if they believed this theory or had a reasonable doubt of it, they should acquit. This instruction, in connection with the other instructions, is not prejudicially erroneous.

Complaint is also made that during the course of the trial the court ordered the defendant committed to the custody of the sheriff. This it is insisted indicated to the jury the opinion of the trial judge. The court had express authority to make such order. Section 2724, Comp. Stat. 1921. Nothing is suggested that would indicate an abuse of discretion.

Some other assignments of error are argued in the briefs, but none of them are of sufficient importance to call for special discussion.

Upon a careful consideration of the entire record, we find no material error.

The case is affirmed.

DAVENPORT and CHAPPELL, JJ., concur.