Donald J. COWLING, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12582.

Criminal Court of Appeals of Oklahoma.

June 18, 1958.

Louis Smith, Cecil E. Robertson, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., J. Walker Field, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The plaintiff in error, Donald J. Cowling, hereinafter referred to as defendant, was charged by information in the district court of Muskogee County with the crime of manslaughter in the first degree, was tried before a jury and found guilty of the crime of manslaughter in the first degree, and punishment fixed by the jury at imprisonment in the penitentiary for a term of twenty-five years.

Counsel who represented defendant at the trial asked to be discharged after giving proper notice for appeal, and the court appointed new counsel at the expense of the State to represent defendant on appeal, and the record was furnished without expense to the defendant.

The appeal is based on two propositions:

(1) "That the verdict and judgment of the court and jury is not sustained by sufficient evidence"; and

(2) "That the verdict is excessive and is contrary to law."

Treating the propositions in the order presented, we note that the charging part of the information reads:

"* * * that Donald J. Cowling did, in Muskogee County, and in the State of Oklahoma, on or about the 15th day of December, 1956, and anterior to the presentment hereof, commit the crime of manslaughter—first degree, in the manner and form as follows, to-wit: That the said Donald J. Cowling did then and there knowingly, willfully, wrongfully, unlawfully, and feloniously make an assault in and upon one Alice L. Cowling with his fists and shod feet, without a design on the part of him, the said Donald J. Cowling, to then and there effect death, but in a heat of passion and in a cruel and unusual manner did then and there inflict upon the said Alice L. Cowling, certain mortal wounds; breaking one of her jaws, breaking some of her ribs, causing a concussion of her brain, and a collapse of her right lung, of which

said mortal wounds, the said Alice L. Cowling, did, languish from the 15th day of December, 1956 to the 20th day of December, 1956, and from said mortal wounds, the said Alice L. Cowling did, in said county and state, on the 20th day of December, 1956, die; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

The deceased was the wife of the defendant, weighed but 95 pounds. She died five days after receiving the injuries charged. The State depended largely on the evidence of three small children of the defendant and the deceased.

Donna Sue Cowling testified that she was ten years of age and lived at 2216 Jefferson, Muskogee. She said that her mother's name was Alice Lucille Cowling and her father's name was Donald J. Cowling; that she remembered the night her mother was hurt; that she and the other children, Diane and Sammy, were in bed; that Diane was nine years of age, and Sammy seven. She said that her mother was in the bath room, and that she heard her mother say: "Daddy, stop hurting me, stop hurting me," and that was all she said.

Witness further testified that her mother and father were in the living room when the mother was telling her father to "stop". She said that her mother then walked into the bed room, and her sister Diane phoned the doctor, and that an ambulance came and her mother went to the hospital, and after five days her mother died.

Witness on cross-examination said that after the mother left by ambulance her father laid down on the bed with his clothes on and went to sleep, and when he woke up the next morning he asked the children where their mother was; that they finally told him that she had gone to the hospital. She said that she and her brother and sister were still living at home with their father, who worked at Sand Springs and drove back and forth daily, and that he brought them to court and told them to tell the truth just as it happened, regardless of whether it hurt him or helped him.

Diane Cowling testified that she was nine years of age, that her father's name was Donald J. Cowling and her mother's name was Alice Cowling. She said that she remembered the night her mother was hurt in the home; that it happened around eight or nine o'clock; that she was in bed; that she heard her father ask her mother to fix him some oysters and her mother could not find any oysters, and her father got mad and started fighting and she heard her mother tell him to stop, but he did not stop. She said that after a while her mother came in and laid down on one of the beds and smoked a cigarette. Witness said that her mother asked the older sister to call a doctor, but she would not, so witness called Dr. Cameron; that her father had on a T shirt and pants and he laid down on a bed and went to sleep, and that this happened before her mother left for the hospital. Said she:

"Yes, mother told us to lock the door when she left and not let anyone in, and he [her father] was lying on the bed when I went by and closed his door."

Gilbert Smith testified that in December, 1956 he worked for the Royal Ambulance Service as a driver and that he was called to the Cowling residence in the twenty-one or twenty-two hundred block on Jefferson, Muskogee, and took a woman named Cowling to the Baptist Hospital; that she had on a night gown, and was sitting in a chair in the living room when he went in. He said that he noticed a few blood stains on the gown. He said that he did not see the husband.

Dr. Tom S. Gafford, Jr., testified that he was a pathologist and that he performed an autopsy on Alice Cowling. As to the autopsy, he said:

"Briefly, the autopsy showed evidences of a very severe physical beating which was manifest by numerous.

bruises all over the body and over the head and evidences of internal injury producing from this beating. Also present at autopsy was a brain tumor which also showed evidences of external blows. There was severe damage to the brain and especially to the vital centers in the brain produced by blows and bruises to the head.

"Q. Doctor, what kind of a blow would it take on the human skull to damage the vital centers of the brain such as you have testified you found at the time of the autopsy on Mrs. Cowling? A. It would have to be a severe blow and certainly not one of any small magnitude and usually either an extremely severe blow or numerous repeated blows of a lesser magnitude.

"Q. Did you have occasion to examine her jaw, Doctor? A. I didn't examine her jaw, except externally of course.

"Q. What about her ribs? A. She had fractures of the—I will have to refresh my recollection here to find out which side—the right side, she had fractures of the ribs on the right side with damage to the underlying covering of the lungs.

"Q. What kind of a blow does it take to produce that, Doctor? A. That takes a very severe blow. I would say it would be difficult to render such a blow without some object held in your hand unless, of course, it was an extremely strong man or a strong physical individual could do it possibly with his fist. I would say that most often such blows are produced by what in common parlance we refer to as stomping or kicking.

"Q. Kicking a person with the shoes on could cause that, could it? A. Yes, sir; it could.

"Q. Did you examine her lungs? A. Yes, sir; I did.

"Q. Tell the jury what you found there? A. She had evidence of fluid in the lungs also bruises in the lungs in the area adjacent to the blow.

"Q. From your examination of her, doctor, would you tell the members of this jury what, in your opinion, was the cause of Alice Cowling's death? A. I think without question that the cause of death was a direct result of severe trauma, that is, severe blows which produced the damage to the brain and which caused her death."

On cross-examination witness said that the brain tumor he found in Mrs. Cowling's head was not caused by any recent injury, and that in due time such a tumor, in the absence of treatment, would have caused death.

Barbara Chaney Wilson testified that she was a registered nurse and worked at the Muskogee General Hospital, but in December, 1956 worked at the Baptist Hospital; that she remembered Mrs. Cowling being a patient at the hospital; that she remembered giving Mrs. Cowling's gown to Mrs. Cowling's mother. She was handed a gown marked State's Exhibit No. 1, and identified the garment as the gown.

Mrs. Nina Pratt testified that she lived at Wagoner and was the mother of Mrs. Cowling; that her daughter was 29 years of age at the time of her death, was 5′2 or 3½ inches tall and weighed about 95 pounds. She identified State's Exhibit 1 as her daughter's night gown, and said that after her daughter was in the hospital the nurse gave the night gown to her, and she turned it over to the county attorney.

Andy Reeves, detective in the Muskogee Police Department, testified that he observed the defendant in the county attorney's office the day Mrs. Cowling died, and noticed that defendant's knuckles were skinned.

B. C. Oman, county investigator in the county attorney's office was shown State's Exhibit No. 1 and said that the exhibit, a night gown, was turned over to him by Mrs. Pratt, the mother of Mrs. Cowling,

at the county attorney's office and had been in his custody ever since. The court refused to admit the gown into evidence, on the ground that it had not been sufficiently identified.

The above ended the evidence for the State. The defendant demurred to the evidence, and his demurrer was overruled.

The defendant testified in his own defense. His testimony is summarized by his counsel as follows:

"The defendant was the only witness to testify in his behalf. He testified that he was an electrician by trade. He had worked at Sheffield Steel Company at Sand Springs and came to Muskogee in 1951; he began working at the Brockway Glass Company here in 1956, and had been so employed for more than eleven years; he had served in the Navy from December, 1943 to February 7, 1945.

"On the day in question he and a friend stopped in at a tavern for a beer. They stayed in the tavern until about midnight when he realized that he was getting 'pretty drunk and I better try to get home'. He did not remember when he got home, nor did he remember anything after he got home. When he woke up the next morning about daylight, he still had his clothes on, and asked the children where their mother was."

The State brought out on cross-examination that defendant, after the happening at his home, did notice that two of his knuckles were skinned. He said that he was about 6'2 or 2½" tall, and weighed about 185 or 190 pounds. He admitted that his wife had weighed about 95 pounds. He was shown the night gown, State's Exhibit No. 1, but denied knowing whether it was his wife's night gown or not. He said that he did not remember anything at all that happened the night in question from the time he left the Rock Inn.

In rebuttal Mrs. Bertha Porter testified that she lived next door to the defendant. She said she remembered the day Mrs. Cowling died. She heard about it over the radio broadcast. She said the same day the defendant came over to her house and talked with her and in the conversation said that he wished he had listened to his wife.

■ The above closed the evidence for both the State and the defendant. We have carefully read the instructions given by the court to the jury. We conclude that the issues were fairly presented to the jury. Particularly, the court instructed the jury concerning the question of drunkenness as a defense. The jury was instructed that it must be satisfied that defendant was so under the influence of intoxicating liquor at the time, that he was mentally unable to form an intent to commit the offense charged; that drunkenness in itself was no defense, unless the drunkenness was of such character that it deadened the reason or understanding to such an extent that accused was unable to form any intent in his mind to commit the crime. But in such connection, the court instructed the jurors that if they believed from the evidence that the defendant was so under the influence of liquor as had been set forth that they should acquit defendant.

■ The case was fairly submitted. The jury was the judge of the facts. The evidence that we have set out was sufficient, if believed by the jury, to support its verdict of manslaughter in the first degree.

■ This court has many times said that where there is substantial evidence, although conflicting, to support a verdict of guilty, the weight of the evidence and credibility of the witnesses is for the jury, and this court will not disturb the verdict for insufficiency. Centell v. State, 46 Okl. Cr. 14, 287 P. 429; Sasser v. State, Okl. Cr., 309 P.2d 1090; Igo v. State, Okl.Cr., 267 P.2d 1082; Sholes v. State, 97 Okl.Cr. 158, 260 P.2d 440.

■ The contention that the verdict is excessive cannot be sustained. We do not discover from the record how the verdict could be excessive if the testimony of the

State's witnesses is to be believed. Their evidence stands unrefuted. The defendant simply claimed that he was intoxicated and does not know what happened. His wife was badly beaten up; the children heard their mother begging their father to "stop". Five days after the encounter his knuckles were skinned. He admitted that after he sobered up he noticed his knuckles. The evidence leaves no doubt that defendant inflicted the beating testified to by the examining physician. The wife was frail. It is true that she had a tumor of the brain that, if it had remained untreated would have eventually caused her death, according to the medical testimony, but the medical testimony was to the effect that the beating was the direct and proximate cause of her death.

This is indeed a tragedy, and is one more of the myriad of cases where liquor has wreaked misfortune and dissolved a home, and where usually the minor victims are left without the love and care of parents and become the wards of the State. Such brings grief to every thoughtful citizen to whose attention such unfortunate episodes may be called. But our conclusions here must be based on rules of law, and the principle that must govern in this case with reference to modification is set out in Barnett v. State, 25 Okl.Cr. 230, 219 P. 726, cited by defendant in error, and in many other cases, where we have said:

"Before this court is authorized to modify a judgment of conviction by a reduction of the punishment imposed, it must clearly appear that the punishment imposed is excessive or probably the result of passion and prejudice on the part of the trial jury, or else that some substantial error of law has occurred at the trial prejudicial to the defendant in the amount of punishment imposed."

Finding no error, the verdict and judgment appeared from must be, and is, affirmed.

BRETT, P. J., and NIX, J., concur.