Sammy Floyd BENEFIELD, Plaintiff
in Error,

v.

STATE of Oklahoma, Defendant in Error.
No. A-12846.

Court of Criminal Appeals of Oklahoma.

Sept. 14, 1960.

Carroll Samara, Marian Opala, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Sammy Floyd Benefield, plaintiff in error, hereinafter referred to as defendant, was charged in the district court of Oklahoma County with the crime of forgery in the second degree; was tried before a jury, convicted and sentenced to a term of one year in the State Penitentiary at McAlester.

The information charged in substance that defendant, Sammy Floyd Benefield, by use of a credit card No. B–28278 328..8, issued by Phillips (Phillips Petroleum Company) to Geo. O. Nolley, 211 Pembrook, Fort Worth, Texas, obtained $4.10 worth of gasoline from Bernie's APCO station, 3701 S. May, Oklahoma City, on credit card invoice No. 2645772 by forging the name of George O. Nolley to said invoice. We do not discover where a demurrer was lodged to the information, and for the sake of brevity will not quote the information verbatim.

Title 21 O.S.A. § 1577 seems to be the basis for the prosecution. It reads:

"Every person who sells, exchanges or delivers for any consideration any forged or counterfeited promissory note, check, bill, draft, or other evidence of debt, or engagement for the payment of money absolutely, or upon

any contingency, knowing the same to be forged or counterfeited, with intent to have the same uttered or passed, or who offers any such note or other instrument for sale, exchange or delivery for any consideration, with the like knowledge and intent, or who receives any such note or other instrument upon a sale, exchange or delivery for any consideration with the like knowledge and intent, is guilty of forgery in the second degree."

For reversal of the conviction, counsel advances four propositions which will be treated in order presented.

It is first argued that the trial court committed prejudicial error in admitting into evidence over the objection of defendant, a photostatic reproduction of the original credit card invoice or credit slip, being the instrument purportedly bearing the signature of George O. Nolley to whom the credit card authorizing the sale of gasoline, etc., had been issued.

Although the original of the photostat had been used at defendant's preliminary hearing, the same became lost from the county attorney's file and this was not discovered until the morning of trial.

Charles Gregory testifying as a witness, said that he was an assistant county attorney of Oklahoma County, and represented the State at defendant's preliminary hearing. He was handed State's Exhibit No. 1, a photostat, and said that he had seen the original and introduced it at the preliminary hearing, and that the facsimile contained pertinent information in regard to the sale and signature that was on the original.

On cross-examination, witness remembered there was some inquiry at preliminary hearing about a license tag number that was written by pencil on the original invoice. He said that he did not recall whether the tag number had been written on the front or back of the card. When asked if he could positively identify the exhibit as being a correct picture of the original, witness said: "If I can qualify my answer, it would be in the affirmative; however, it is an exact duplicate of the specific items that I do remember about that ticket."

Bernie Mathis testified that he operated Bernie's APCO service station at 3701 South May, Oklahoma City; that he honored all credit cards but the purchaser was required to sign a sales slip, signing the name to whom the credit card had been issued.

Witness was shown State's Exhibit No. 1, and he testified that it was a facsimile of the original slip that had been in his possession. He said that he went to the Anderson-Prichard Oil Company the morning of the trial and they made him a photostat of the duplicate of the credit slip in their possession. He said that the actual date of sale was October 29, 1958, although his credit card machine was erroneously set so that it stamped "10–29–59" and all invoices that day were so dated. He turned in one of the invoices to Anderson-Prichard for gasoline.

On cross-examination witness said that he had noticed a license plate number on the original, but that it was blurred. He further said that on the date of the sale in question, he had a young man working for him by the name of Roger Chancellor. He was asked: "Is he the one that waited on this boy?" He answered "Yes".

Roger Chancellor testified that on October 29, 1958 he was working as an attendant at Bernie's APCO service station, 3701 South May. He said that on said date he sold the defendant twelve and five tenths gallons of gasoline, the total price being $4.10; that defendant presented a Phillips credit card issued in the name of "George O. Nolley". Witness positively identified the defendant, Sammy Floyd Benefield, as the man who received the gasoline, and signed in his presence the name of George O. Nolley to the credit invoice. Witness was handed for identification State's Exhibit 1. He said that the exhibit was a fair reproduction of the original credit ticket. That he had never seen the defend-

ant before this transaction; that he put the invoice ticket in the cash register, and that it was later turned over to the APCO company.

On cross-examination witness said he testified at the preliminary hearing that he wrote the license tag number on the original credit invoice. He said he thought the car that he put the gasoline in was a 1952 Studebaker, and that it had a California license tag on it, but said that he was not sure about that. He did not remember the number of the tag that he wrote down, but remembered that it was a 1– number. He said that he wrote the numbers before the car left the station. Defendant counsel asked witness if the number 1–69758 sounded about right, and he answered: "I don't say, because I don't remember the tag number."

George O. Nolley, 1505 East 29th Street, Tulsa, identified State's Exhibit No. 2 as a credit card issued to him while he was living at Fort Worth, and stated that it disappeared from his automobile about October 19, 1958. He said he next saw the card on December 18, 1958 in the investigation room at the Oklahoma City police station; that he did not know the defendant at the time of missing the card, and had never given him or any other person permission to use it. He identified the Anderson-Prichard sales slip, State's Exhibit No. 1, and said that he saw the original at the police station in Oklahoma City on December 18th, and that police officers George Leach and C. C. Walker and himself were all present at the time of the interrogation of defendant Benefield. Witness said that he heard officer Leach ask Benefield if that was his signature on the credit slip and Benefield said it was. On direct examination witness further testified:

"Q. Do you recall seeing the signature that is on this facsimile, George O. Nolley, at that time? A. Yes, sir.

"Q. Was it your signature? A. No.

"Q. I will ask you if the signature, George O. Nolley—you are familiar with your own signature, I take it? A. Yes, sir.

"Q. Was this a reasonable reproduction of the signature you saw on that day? A. Nothing like it.

"Q. I mean on that card. A. Oh, yes, sir. It's nothing like my signature, though.

"Q. Look that over and see if you recognize any of the other subject matter of the card as being on the original. A. To the best of my recollection, its all there just as I saw it that day."

On cross-examination, witness testified that he did not recall seeing any pencil notations on the original credit ticket when he saw it at the police station. He stated there was nothing to indicate that the defendant had stolen his credit card.

C. C. Walker, Oklahoma City police officer, testified that on December 17, 1958 after defendant had been arrested, he and officer George Leach had a conversation with the defendant in the interrogation room at the police department; that they first advised defendant that he did not have to tell them anything unless he wanted to, and if he did it could be used against him as evidence.

After identifying the credit card, State's Exhibit No. 2, witness related the following conversation they had with the defendant:

"A. We asked him if he had used this credit card and he said that he had, after he had looked at it, and we asked him where and when he used it, and he told us that the last of October he made a trip to California and before leaving for California he had filled his automobile up with gasoline at a service station on south May Avenue. The exact location of the service station, he did not know at that time. He said that he used this credit card to purchase the gasoline that he put in his automobile. We asked him where he got the credit card.

"Q. What did he tell you? A. He told us that the credit card was given to him by a Bill Sea."

Officer Walker was then handed State's Exhibit No. 1 for identification. He said that it was a photostat of the credit card invoice. Witness said that on December 18 he had a further conversation with the defendant at the police station, in the presence of officer Leach and George O. Nolley, in regard to the original charge ticket. That the original ticket was laid before the defendant and he was asked if he had signed the name "George O. Nolley" on the charge ticket, and that defendant admitted that he had.

On cross-examination, when witness was asked if there was any other writing on the front of the photostat, he said, "I noticed here the place for a license tag, that it isn't legible, and, as I recall, on the original it wasn't legible". He said there were numbers on the original charge ticket, but they were not legible enough for them to run a registration on the tag number to ascertain the make and model of the car. He said the defendant told them he drove a Studebaker station wagon to California.

On re-direct examination witness testified that about 9:15 on the morning of the trial, he and Mr. Nolley went over to the credit department of the APCO company and got a photostatic copy of the credit slip. That it was taken from a film. That he was not present when this was done.

Upon the evidence recited, the court admitted State's Exhibits Nos. 1 and 2 in evidence and overruled defendant's demurrer.

The defendant Sammy Floyd Benefield testified in his own defense. He said that he was 25 years of age, denied that he was in Oklahoma City on October 29, 1958, which was the day the alleged crime was committed and stated that on that date he was in Atoka visiting his father. He said that he came to Oklahoma City on the 2nd or 3rd of November, and left on November 4th, driving a 1958 Studebaker station wagon to California, and that he returned to Oklahoma City about December 12, 1958. He further said that the station wagon had a California license plate on it, but he denied that he ever went to Bernie's APCO station, and denied that he bought any gasoline at Bernie's APCO station on October 29, 1958 or at any other time. He said that he did not know where the station was, only from the address he heard.

Witness denied that he told officers that he signed the name of George O. Nolley on the credit ticket. He testified that the officers showed him the original credit ticket at the police station and that he also saw the original at the preliminary hearing, and that there was a license plate number written on the credit card.

On cross-examination defendant testified that he received the car from a man by the name of Atkinson, who lives in Long Beach, California; that Atkinson had eight or ten cars located at 35th and Walker, and witness went there and picked up the Studebaker.

Witness said that he heard the officer testify that witness told him that he got a credit card from a Mr. Sea. Defendant said, "Oh yes, I know Mr. Sea". He said that he had known him seven or eight months and knew him three or four months prior to this incident. Defendant said that Mr. Sea is now in the State Penitentiary at McAlester. He denied that he told the officers that Sea had given him a credit card.

From a consideration of the evidence, did the trial court err in admitting the photostat of the original charge ticket in question?

Counsel for defendant points out 12 O.S. 1951 § 522, being known as the Uniform Photographic Copies of Business and Public Records as Evidence Act. It provides:

"If any business, institution, member of a profession or calling, or any department or agency of government, in the regular course of business or activity has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any Act,

transaction, occurrence or event, and in the regular course of business has caused any or all of the same to be recorded, copied, or reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic, or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless held in a custodial or fiduciary capacity or unless its preservation is required by law. Such reproduction, when satisfactorily identified, is as admissible in evidence as the original itself in any judicial or administrative proceeding whether the original is in existence or not and an enlargement or facsimile of such reproduction is likewise admissible in evidence if the original reproduction is in existence and available for inspection under the direction of the court. The introduction of a reproduced record, enlargement or facsimile, does not preclude admission of the original."

Prior to this Act the general rule was that copies of a writing should be considered as secondary evidence, and not admissible "unless a basis is laid for their recaption by showing that the original cannot be produced." 20 Am.Jur., Evidence, § 426.

Counsel argues that the State wholly failed to lay a proper predicate, by requisite proof, so as to comply with the language of the statute above quoted.

Possibly the county attorney was not familiar with the provisions of 12 O.S. 1951 § 522, and might have had someone from the Anderson-Prichard Oil Company testify as to their film records of sales slips as was involved in the transaction here. However, the evidence was that the lost sales ticket had been introduced in evidence at the preliminary hearing; a number of the State's witnesses had seen it and identified the photostat as an exact replica; the defendant and his counsel had examined the ticket; one witness had seen the Anderson-Prichard film from which the photostat was made, but he did not see the actual printing. The service station employee who stamped the sales ticket in the machine for that purpose and who swore to seeing the defendant sign the name George O. Nolley to the same, testified that the photostat was an exact replica, except for a pencilled notation of a car tag number which did not show.

■ The fact that the filming process apparently did not show the pencilled notation of the tag number, under the evidence in this case, could not have prejudiced the defendant. At preliminary he and counsel had deciphered the tag number on the lost original sales slip, and he did not, when testifying, say that it varied from the tag number on the car that he drove to California.

The question of the correctness of the photostat was a preliminary one for the determination of the trial judge. The identification satisfied the court. Only where there would be an absence of discretion would this Court be justified in reversing the case on account of the admission of a photostatic copy of a record. The evidence refutes an abuse of discretion. See Mow v. People, 31 Colo. 351, 72 P. 1069, where it is said:

"In order to warrant the admission of a photograph in evidence, it is only necessary to show, if otherwise competent, that it is a correct likeness of the objects it purports to represent, and this may be shown by the one making it, or by any other competent witness."

And see. Berkovitz v. American River Gravel Co., 191 Cal. 195, 215 P. 675, 676, where it was held:

"Testimony that a photograph is a correct representation of the object sought to be shown is sufficient foundation for its admission; and this need not by given by the photographer, but may be given by any one having sufficient knowledge of the object to say that the photograph is a faithful representation thereof."

This proposition is approved in principle in Findley v. State, 29 Okl.Cr. 351, 234

P. 227, syllabus two by the Court. And see Provident Life & Accident Ins. Co., etc. v. Everett, 177 Okl. 588, 61 P.2d 679. Also see note 9 A.L.R.2d p. 910, et seq.

It is next contended that the trial court committed error in permitting the prosecution to interrogate the defendant concerning details of an unrelated crime.

This problem usually arises where a defendant is charged as a second offender, and the county attorney in making out his case offers proof of one or more prior offenses.

■ The rule to be followed as may be found in Matchen v. State, Okl.Cr., 349 P.2d 28 following Little v. State, 79 Okl.Cr. 285, 154 P.2d 772, is:

"While county attorney may interrogate defendant concerning other convictions for crime for the purpose of affecting his credibility, the trial court should not allow the examination to be enlarged by asking the details of the crime in which conviction was sustained, as such examination might cause jury to place undue emphasis on former conviction of accused and thus cause them to convict mainly because of bad reputation of the accused."

Recently we had a case before us, and being Ervin v. State, Okl.Cr., 351 P.2d 401, where the State in making out its case proved three convictions by the introduction of the judgment and sentence in each case, along with the identification of the defendant as the same person referred to in the judgments and sentences. On cross-examination the county attorney attempted to question the defendant as to the details of each crime for which he had been convicted, apparently to show a pattern or method used in prior burglaries, as having some bearing on the current charge. We had to reverse the case for new trial. Here, the within defendant was not charged as a second offender. He did, however, testify and his own attorney brought up the matter of a previous conviction.

The question is, did the cross-examination by the county attorney that followed re-quire a reversal of the case. We shall set out the questions and answers verbatim, as follows:

By Mr. Samara (Attorney for defendant):

"Q. You have been in trouble before, haven't you? A. Yes, sir.

"Q. Have you ever been convicted of a felony? A. In 1954.

"Q. Did you go to the penitentiary? A. No, sir, I got a suspended sentence.

* * * * * *

"Q. Have you been charged with forging any checks or anything? A. No, sir."

Cross-examination by Mr. Reynolds:

"Q. You testified you have been in trouble before didn't you? A. Yes, sir.

"Q. That you were convicted in 1954? A. Yes, sir.

"Q. You were convicted of burglary in the second degree at that time? A. Yes, sir.

"Q. You got five years suspended sentence? A. Yes, Sir."

Now follows the two questions urged as ground for reversal:

"Q. What was the nature of the premises with which you were charged with having burglarized? A. A home.

"Q. Where was it? A. It was on northwest 9th."

Objection was not interposed as to these two questions, although just prior to these two questions the county attorney had asked: "In regard to your conviction in 1954, burglary in the second degree, what were you charged with having burglarized on that occasion?"

Counsel objected and the court sustained the objection. No doubt the court would have sustained a further objection if it had been interposed, and would have directed the jury not to consider it, if asked.

The court did give a cautionary instruction limiting the purpose for which the jury could consider the evidence relating to the

former conviction, even though the matter was brought up by defense counsel, who no doubt supposed the State would bring the matter up on cross-examination, and that it would be better for him to first mention the matter.

While we do not approve the two questions, we do not believe, in view of the record, that the error is sufficient to cause a reversal of the case, particularly so in view of the positive identification of defendant as the person signing the ticket in question and using the Phillips credit card.

Next, the record shows that after the jury had deliberated upon their verdict, they returned into court in charge of their bailiff, and in the presence of the defendant and his counsel, the foreman of the jury submitted the following question: "Can we recommend defendant be put on probation?"

Thereupon, the court advised the jury that the recommendation would in no way be binding upon the court, and that it was not a matter for the consideration of the jury. The jury then retired for further deliberation.

Prior to the court's statement to the jury, the court had conferred with the attorneys about the inquiry made, and counsel for defendant had requested the court to merely answer the question in the negative. It is here urged that the failure of the court to merely answer the question in the negative constitutes error.

Often juries have written recommendations on verdicts, and as often on appeal this Court has said that such recommendations must be treated as surplusage, and not binding upon the court.

The matter of granting a suspended sentence to one convicted of crime, if he is eligible, is in the sound discretion of the court. And while that is true, some courts might appreciate the recommendation of the jury, even though not binding. So a recommendation does not vitiate a verdict. Here the defendant was not eligible, because of a previous conviction. 22 O.S. 1951 § 991. But in no event would the question of probation be for the consideration of the jury and any recommendation they might make would not be binding upon the court, and the court so advised the jury. The court could have answered the question by simply saying "No", as requested by defense counsel. We do not believe that the court was obliged to tell the jury that even he was barred from giving a suspended sentence by reason of defendant's previous conviction.

We find no error.

It is finally urged that the punishment assessed is excessive and should be modified. The punishment for forgery in the second degree is by imprisonment in the penitentiary not exceeding seven years. 21 O.S.A. § 1621. The punishment assessed of one year was near the possible minimum.

The verdict and judgment are affirmed.

NIX and BRETT, JJ., concur.