John Junior BLANTON, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12887.

Court of Criminal Appeals of Oklahoma.

Nov. 23, 1960.

Alvin C. Bruce, Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

PER CURIAM.

John Junior Blanton was charged by information filed in the district court of Carter County with rape, first degree, was tried before a jury and found guilty of the included offense of assault with intent to commit rape, but the jury being unable to agree upon the punishment left that to the court, who assessed a penalty of five years confinement in the State Penitentiary.

For reversal counsel in brief argues two propositions:

"First: That the court erred in refusing to sustain plaintiff in error's demurrer to the state's evidence on account of insufficiency of the evidence.

"Second: Errors of law occurring at the trial, which were duly excepted to by plaintiff in error.

The State has not favored the Court with a brief.

We shall treat the issues in the order presented, referring hereinafter to the plaintiff in error as defendant.

Treating the first issue, the question simply is, did the State make out a case.

The prosecuting witness and alleged victim, Faye Knight, testified that at the time of the trial she was eighteen years of age, but was seventeen years old at the time she said she came to Ardmore, on August 27, 1959, because "Mrs. Shantz" had sent her to Judge Legate, the county judge, by reason of her being pregnant. She testified that when she got to Ardmore she went to see Major Kee (of the Salvation Army), who sent her to the Central Rooms, and later gave her a meal ticket to eat at Dessie's Cafe. After the meal she decided to walk down on Caddo Street, shown to be what is known as a "tough" street in Ardmore. She said she wanted to look around at some second-hand clothes and see if perchance her aunt and uncle, June and Clark Clement, of Healdton, were down on that street. She admitted on cross-examination that they usually visited and traded on Caddo Street on Saturdays, but said they sometimes would appear on other days of the week.

Witness went to a domino parlor and made inquiries. She said that she left the domino parlor and crossed the street to a fruit stand to make inquiries. Then she saw the defendant and another boy sitting in a car, and the defendant "hollored" and said, "Well, don't I know you?" She said that the defendant then pushed her into his car, and got her by the arm and pulled her. She said that the other boy in the car was Herbert West, who drove the car. She said that this was after dark, about 9:30 at night; and that the two men drove her to the country to the Sway Back beer joint. She said they stayed there a short time, but did not go in. That her companions were waiting for another car; that when it arrived they talked to the driver, then drove on; that they would not let her get out. Witness denied that she drank any beer. She further testified:

"We went about a half a mile, or a mile, on down that there road, and then he stopped, and Junior Blanton told Herbert West to go get his car, somebody borrowed it or something. Then Junior Blanton started putting his hands on me, and I told him that I wasn't that there kind of a girl. He said he didn't care that he was going to anyway.

"Q. Is that what he said, that he was going to anyway? A. He was going to get some anyway.

"2. What did you say then? A. Well, he got out on that—on the other side of the car door, and about time I got my arm on this side, well he was on that side.

"Q. Well, now, we're talking about these sides. What side did you put your arm on? A. On the right, I was sitting on the right and he was— and he was over on the—he skooted over that way to get out.

"Q. I see. A. By the time he got out, well, he was on that there other side.

"Q. Well, did you get out of the car? A. Well, yes, but he came over there and opened it.

"Q. I'm sorry, I couldn't hear you, he came over there — A. He came over there and opened the door.

"Q. Well, did you get out then? A. Yes. And I started running.

"Q. Which way did you run, to the front of the car or the back of the car? A. Run to the back of the car.

"Q. Back of the car. What heppened then? A. Well, he caught me and kind of pushed me down, and he skinned my leg, and then I got up and runned again, and he pushed me down again, then he started pulling on my blouse and then he pulled on my pants. Then finally he got them off.

"Q. What did he do when he got your panties off, Faye? Can you tell us?"

Witness, to the last question said that she "could come out and tell" what defendant did. She used the vulgar name for the sexual act, being in meaning that defendant had sexual relations with her. Further she was asked and answered:

"Q. Do you know what a penis is, Faye? A. Yes.

"Q. What did he do with his penis? A. He stuck it in me.

"Q. Are you sure he put it in you? A. Yes. I'm sure.

"Q. Did he do anything to your brassiere at that time? A. Yes. He undone that little old strap thing.

"Q. What did he do then? A. He took it down and then he got to biting me.

"Q. Where did he bite you? A. On the left side of my breast.

"Q. Were you trying to fight him during this time? A. Yes.

"Q. What county were you in at the time this happened, Faye? A. Carter.

"Q. What happened after this was over? A. He went to that there—that there fellow, well, he went to that there whiskey joint."

Witness further testified that after defendant got through, that Herbert West got on top of her. She said that the defendant had intercourse with her three or four times. No objection was interposed to the question and answer, and no motion was made to require the prosecution to elect. In fact, this question is not an issue anywhere in the proceedings. The instruc-tions given by the court were not excepted to, and no different or additional instructions were requested.

Witness said that the defendant and West finally got back in the car in the front seat and put her in the back seat, and they then drove to a "whiskey joint" where they stayed for about thirty minutes. She said that both of the men got out of the car, but kept watching her; that she motioned to the man who ran the place and asked him if he could get her away from there, but that he said no, that he owned the place. This was some time after 11:00 o'clock at night.

Witness stated that following this the defendant and West drove to defendant's sister's house and got a baby to take to defendant's mother. It was about two years old. They stopped at a drive-in and defendant gave the child and her each a coke.

Witness further testified:

"Q. What happened after that, Faye? A. Well—well, they took the baby home and they went back to that there—oh, back to that there whiskey joint and they was talking about gambling or something there, or about some money or something. And they—well, they was still in the car when they drove up, and they just got to talking, and they went out there to that there Nob Hill. And Junior Blanton and Herbert West got out of the car, and I was looking to see if it was out in the clear where I could run to that there Nob Hill. Is that the name?

"Q. Un-huh. A. And I went and told that there colored women and I went and stayed in that there rest room.

"Q. Well, now, whereabouts was this rest room and where was the colored lady? A. She was at the front.

"Q. Where, at Nob Hill? A. Un-huh.

"Q. Where did they go, do you know? A. Who?

"Q. Were they in Nob Hill? A. No. They went next door playing gambling in that little old white house.

"Q. All right. A. And I went running in and told them to call a cab, or something. And, so she told me to stay in that there rest room. And so, the cab came, but she told me not to go out there, cause them two boys was out there. And I don't know who called—called the police.

"Q. Did the police come out? A. Yes.

"Q. What did the police do then? A. It was some colored police come after me first, that was a colored place. And, so, he—I got—I ran to his car, and he called back to that there other car. And they took me—they brought me back to, I think, over to the jail house—then they took me to a hospital, to have a check-up. Then they brought me back to the jail.

"Q. Did you have a check-up at the hospital? A. Well, they went and checked me."

On cross-examination witness said that she was pregnant; that a man in Chickasha promised to marry her but that it turned out that he was already married. She admitted to living in numerous towns with her father and mother; admitted that she had been on Caddo Street many times, coming over from Healdton when her folks lived there, but said that she came with her mother. She denied walking with defendant up Caddo to Main Street. She admitted that the defendant on the drive talked about gambling and that the men got some whiskey some place, and did drink beer and whiskey, but she denied that they gave her any.

Witness admitted that one Shorty Collins tried to rape her prior to the within case, but said that he did not succeed, and she did not cause a charge to be filed against him.

Earl Haun, policeman, testified that on the night of August 28, 1959 he got a call to go to a place called Knob Hill; that when he got there he parked on the north side of the road and officer Sofas brought a girl over, whom he identified as the prosecuting witness, Faye Knight. He said that she was crying. Further:

"And she was—her hair was all messed up, her clothes was messed up, and her legs skinned and bruised.

"Q. Now can you tell us how her clothes were messed up? A. Well, her blouse was all pulled out and her skirt was all twisted up.

"Q. What about her legs, now? A. It was black and blue, and skinned. She had skinned places on her knee and ankle."

On cross-examination the officer said that it was about 2:15 in the morning when he saw the prosecutrix.

Dr. Lloyd L. Long next testified, after his qualifications were admitted, as follows:

"Q. Doctor, I want to call your attention to the early morning hours of the 28th of August, 1959. Did you have occasion to examine a Faye Knight on that morning? A. Yes, I did.

"Q. Do you know about what time it was you made that examination? A. I examined her about three-thirty A.M.

"Q. What did you examine her for? A. She was brought in by the sheriff's —sheriff's department, and I was asked to examine—do a pelvic examination on her to determine whether or not she had had intercourse—

"Q. Did you make that examination? A. I did.

"Q. And what did that examination indicate? A. Well, there were definitely sperm present in the vagina. Which indicated that she had had fairly recent sexual relations.

"Q. Did you examine her body for anything else? A. The only other thing that I recall that she had that I checked was, she had a bruise right over her left nipple.

"Q. Can you state to the court and jury whether or not that was an old or recent bruise? A. It looked like a recent bruise.

"Q. Can you tell from your medical experience what that bruise might have resulted from? A. Well, of course, it could have been from any type thing. I think the question at the time was whether it could have been a tooth mark, or bite, and it could have been that."

On cross-examination witness said that while it varied from individual to individual, that sperm live in the vagina from one to three or four hours. He said that Faye Knight was nervous and upset when he examined her.

This concluded the evidence for the State, and counsel here interposed a demurrer to the evidence, which was overruled and is now complained of.

From the above it is apparent that the prosecuting witness, Faye Knight, a seventeen-year old girl at the time, was an underprivileged girl, ignorant and probably flustrated. She could not be classed as a girl of previous chaste and virtuous character, in view of her two or three months pregnancy at the time of the rape here involved, but such is immaterial as the charge is that the defendant succeeded in having sexual relations with Faye Knight by means of force overcoming her resistance.

While the evidence shows that this young girl was visiting on a tough street of Ardmore to see second-hand clothes, and did, of all places for a young girl, visit a domino parlor, and the further happenings might have been predicted, such facts give no license to any male to prey on the ignorant and helpless female, if such was the case.

It might be argued that she could have screamed and jumped out of the car. She testified that she did get out once and ran, but was pursued, pushed down, got up and ran again, and was pushed down to the ground, her panties torn off, and then she was ravished. She had been taken to a Negro gambling place and for the first time when she was left alone in the car she ran to a rest room and there remained while a colored woman got word to the officers. They found her crying and bruised, and her clothing showing the effects of an apparent struggle.

 The physician, about an hour or an hour and a half later found her limbs scratched and bruised and her left breast bruised. There were live sperm in her vagina. All this corroborated prosecutrix's claim that she had been ravished. She complained to a beer tavern owner, but he would not help her. At her next opportunity she complained to a colored woman, who succeeded in getting officers to come to the rescue. The evidence of prosecutrix can not be said to be, as to material points, contradictory, inconsistent, or unreasonable, or to bear upon its face evidence of improbability. See Roberts v. State, 31 Okl. Cr. 103, 237 P. 148; Law v. State, 92 Okl. Cr. 444, 224 P.2d 278; Roberts v. State, 87 Okl.Cr. 93, 194 P.2d 219. The trial court therefore did not err in overruling the demurrer to the State's evidence.

The defendant introduced evidence to show that he was in the domino parlor when prosecutrix came in, and that he walked up Caddo Street to Main Street with her. Also one Bill Key claimed that he drove the prosecutrix and one Jack Allen and Junior Blanton to a gambling place known as Knob Hill. Other witnesses saw the prosecutrix with defendant but did not notice any compulsion on defendant's part to compel her to stay in the car.

One Therl Kendricks also known as Therl Jones, testified that he picked the defendant and Faye Knight and Herbert West up on Main and Washington, Ardmore streets, on the night of August 27, 1959 and drove them to Walter North's, known as the Sway Back Inn. There was evidence as to defendant drinking beer and intoxicants. There was no evidence that prosecutrix drank beer or intoxicants.

The defendant John Junior Blanton testified. He said on direct examination that he had been convicted of conjoining robbery.

He admitted that Faye Knight was with him from evening until the officers took her early the next morning. He denied that he had sexual intercourse with the girl or was responsible for the scratches and bruises that she testified about. He denied that he kept the prosecutrix from fleeing from the car at the several times they were stopped. He said that he did not molest her in any way.

Herbert West, shown to have been with the defendant and Faye Knight on the rounds the night of August 27 and morning of August 28, 1959, testified and denied that the defendant or he molested Faye Knight in any way.

Thus there was sharp conflict in the evidence.

At the close of all the evidence counsel for the defendant renewed his demurrer to the evidence, which the court overruled.

We have heretofore concluded that the State's evidence was sufficient to make out a case to support the charge of first degree rape. So, while the defendant's evidence was in sharp conflict with that of the State, there was sufficient evidence to go to the jury. It was the jury's problem to resolve the fact questions. Weeden v. State, 73 Okl.Cr. 258, 120 P.2d 379. We have stated the principle this way: This court will not set aside the verdict of a jury where there is a conflict in the evidence. It is only when the evidence is insufficient to sustain the judgment and sentence that such action will be taken. Gordon v. State, 75 Okl.Cr. 356, 131 P.2d 503.

The second assignment of error involves the cross-examination of the defendant by the county attorney. At the onset when questioned by his counsel, the defendant had admitted a previous felony conviction. This admission, of course, could be considered by the jury in the matter of the weight they would give his testimony. And as counsel for the defendant points out, this Court has uniformly held that it is error to permit a county attorney to go into details concerning the crime for which defendant has been formerly convicted, as

that would be a collateral matter, not relevant to the crime charged and that the conviction may only be considered for the limited purpose of assessing punishment, if defendant is found guilty of the offense charged. Ervin v. State, Okl.Cr., 251 P.2d 401.

And this Court has also held as contended by counsel, that while a county attorney may interrogate defendant concerning other convictions for crime for the purpose of affecting his credibility, the trial court should not allow examination to be enlarged by asking the details of the crime on which conviction was sustained, as such examination might cause the jury to place undue emphasis on former conviction of accused, and thus cause them to convict mainly because of bad reputation of the accused. Matchen v. State, Okl.Cr., 349 P. 2d 28. The Court of Criminal Appeals has time and again reiterated these principles. This is elementary, but young and inexperienced county attorneys in their zeal forget themselves at times and such may cause a reversal of a conviction. We therefore examine the cross-examination complained of to determine whether such must cause a reversal of this case.

By Mr. Mordy, assistant County Attorney:

"Q. Now, you told Mr. Bruce, or rather he told you, that you had been convicted of conjoint robbery, is that correct? A. Yes, sir.

"Q. What did you use to rob at that particular time? A. I didn't use a thing.

"Q. Why were you charged with conjoint robbery then? A. I—"

The court overruled the objection interposed. The defendant then denied that there had ever been a robbery. He said that he had a fight and used his fist. He admitted that he was convicted and sentenced to serve five years.

Defendant also admitted that previously he had been convicted of stealing a car, was given a two-years suspended sentence,

but said that the suspended sentence was subsequently revoked.

Counsel argues that since the defendant did have a criminal record, the questioning as to the details of the conjoint robbery conviction "did have a great bearing on the jury's minds in their reaching the decision that they did."

Now, then, it was immaterial as to just how the defendant effected the robbery for which he had been previously convicted. Defendant, however, denied that there had actually been a robbery, but said there had been a fight in which he merely used his fists.

We have previously determined that the State in making out its case produced sufficient evidence to have supported the crime charged, which was rape in the first degree, carrying a minimum of 15 years imprisonment, or life or death. 21 O.S.1951 § 1115. But the jury in spite of the proof of penetration refused to find the defendant guilty of rape in the first degree as charged, but found him guilty of the included offense of assault with intent to commit rape, but left the punishment to the court, who assessed a penalty of five years imprisonment. 21 O.S.1951 § 681.

It is common knowledge that juries at times in the face of the overwhelming guilt of persons charged with crime, find them not guilty, and there is nothing the State can do about it, as it is within the province of the jury to determine the facts. In the within case, then, the defendant certainly got a break by the jury finding him guilty simply of assault with intent to commit rape. The cross-examination in question, therefore, could hardly be said to have caused his conviction. The error of judgment, if any, was in his favor. See Benefield v. State, Okl.Cr., 355 P.2d 874.

The thought might arise, as to whether the jury was authorized to find the defendant guilty simply of assault with intent to commit rape, when he was charged with rape in the first degree. Was not the defendant, in view of the statutes, either guilty of rape in the first degree, or not guilty of any crime?

As heretofore indicated, the crime of assault with intent to rape is an included offense of rape in the first degree. See Woolridge v. State, 97 Okl.Cr. 326, 263 P.2d 196 where the defendant was convicted of rape in the first degree, but where this Court found that as a matter of law there was no sufficient evidence of penetration to support rape in the first degree, and the judgment was modified to that of guilt of the included offense of attempt.

Here, as stated, the evidence supported the charge, but this Court, while it has the power where the record justifies to modify a judgment to a lower included offense, may not, irrespective of the evidence, reject a conviction for an included offense and raise it to the greater offense charged.

We find no reversible error, and the judgment complained of is, accordingly, affirmed.

NIX and BRETT, JJ., concur.