Carl EMERSON, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13377.

Court of Criminal Appeals of Oklahoma.

May 27, 1964.

Rehearing Denied July 1, 1964.

Sam J. Goodwin, Pauls Valley, Wheeler, Parsons, Wheeler, Hampton & Kessler, Oklahoma City, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Charles Owens, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Carl Emerson, hereinafter referred to as the defendant, was charged by Information in the District Court of Garvin County with the crime of Murder. He was tried before a jury, found guilty of Manslaughter in the First Degree, and sentenced to serve 8 years in the Oklahoma State Penitentiary.

Defendant lodged his appeal before this Court within the time allowed by law, asserting two different assignments of error: (1) That the trial court erred in failure to sustain defendant's Demurrer to the evidence and Motion for a directed verdict; and (2) that the trial court erred in giving to the jury Instruction number 5 and 11.

In discussing the first proposition, it will be necessary to briefly relate the testimony.

The deceased and defendant had married sisters and had apparently been the best of friends until about 1960. It was then that defendant's wife became ill with cancer and she was admitted to the hospital in Pauls Valley. She was permitted to leave the hospital in a short period of time to visit with her sister, the decedent's wife. She remained there approximately a week when the sister and decedent took her to a hospital in Ardmore. It is contended by defendant that this was done without his consent. The wife of defendant, during this later hospitalization executed a will diminishing defendant's interest in her estate by devising a portion of her property to other persons. She made deeds to relatives and deeded her farm to her sister, the wife of decedent. During this period, defendant insisted on bringing his wife home and his sister-in-law opposed this strenuously. Defendant contended that his wife was kept under the control of her sister and relatives until her death October 11, 1962, and their influence over his wife resulted in the execution of the will and deed whereby his interest in her estate was considerably diminished. This, of course, created animosity between defendant and the sister-in-law and her husband. About seven months after the death of defendant's wife, her sister and her husband came to the home of defendant ostensibly for the purpose of securing a table. They stated to defendant that their daughter was to be married within a few days and they wanted the table for her. The visit was cordial up to a point. Defendant agreed that they could have the table. He moved the things off the table, and the sister-in-law's husband, the deceased herein, took the table to the car. They then discovered a leaf was missing from the table and all three began a search for the leaf. Defendant contends the sister-in-law went to the car while defendant and the husband went to the smoke house in search of the leaf. Defendant testified it was then that deceased stated, "It's time for you to start paying rent on this place". (No doubt referring to the deed, executed while defendant's wife was in the Ardmore Hospital) Defendant said, "Yes, I know that's the way you people had it fixed down in the hospital". Defendant further testified, "—and thats when he became abusive and I walked away from the deceased and went into the house". The deceased followed defendant stating that he was going to get the leaf or

defendant. According to defendant, the following transpired:

"Q. Then did you tell him not to come in the house?

"A. I did, and I wanted him to leave. I wanted him to leave without any trouble.

"Q. All right. Then what did he do?

"A. He started to reach for the door, and I shot; and I didn't even hit him. I hit the corner of that bathroom."

The testimony is that the defendant didn't want any trouble. The first shot was fired merely to induce the decedent to stop. The testimony on this point is as follows:

"Q. You didn't intend to hit him?

"A. Oh, I didn't want it to happen at all.

"Q. You didn't even shoot at him the first shot?

"A. I certainly didn't. I could have shot him the first time, you know. I sure didn't want to hit him.

"Q. Okay, sir, then what happened, Mr. Emerson?

"A. He started coming. He put his hand in his pocket right here, and I thought he was going to get his gun, and then I shot again, and I hit him right there.

"Q. Now then, that's the second shot that was fired?

"A. That's the second shot.

"Q. Then when you fired the third shot, you say he had started back towards you?

"A. Towards me, yes, sir."

The decedent's wife, the only other witness, testified the same as defendant up to a point where defendant and decedent were in the smoke house, she contends she never went to the car but was never out of hearing distance of her husband and defendant. She testified that the conversation that defendant claims took place never happened. She testified in substance that nothing was said to indicate trouble, but on the contrary, everything was friendly. That when they had finished looking in the smoke house, the following took place:

"A. I led the way out, as I was kinda standing in the door of the smoke-house, and we started cutting across the back, the yard, back toward the car together. He never had appeared again, Mr. Emerson hadn't.

"Q. He went on to the house when you left for the car?

"A. He went in the house when we, he, went in the little smokehouse.

"Q. Yes.

"A. Supposedly to see if the leaf was in there; so as we walked back in vision of the back door, I looked up, I was leading the way, and I looked up, and I saw him standing there with a long gun pointed (indicating).

"Q. Who was this?

"A. Mr. Emerson.

"Q. The defendant here?

"A. Yes sir, back inside the door. We were at the end of the house something about as far as—it was almost as far as Mrs. Meinders is from me here, and he was standing with this long gun like that (indicating), and, but actually, it didn't immediately startle me, I mean it was just, you know, just all right, I had been used to, it didn't startle me instantly is what I'm trying to say; but the minute my husband stepped to my side, he just stuck my hands, like this (indicating), and said, 'Carl, what are you doing?' He immediately realized anyone like that, I'm sure, meant business, I mean you don't aim on anyone. When he said that, it was just almost at that second that he started shooting. We wasn't even up to the porch. There was a little porch built on between this

little jog in the house and this room built on; we didn't even come up to the porch. We were cutting straight across to the gate.

"Q. You missed the porch, but you stopped there? If you had come straight on up—(Interrupted)

"A. Yeah, looked and saw him standing there with his hat on with his gun on us, see.

"Q. Now he was inside the house?

"A. Yes, back from the screen, someways back behind it.

"Q. The screen was closed?

"A. Yes, sir.

"Q. When the shot was fired?

"A. Yes, sir.

"Q. Now was anything said there by you or by your husband at that time?

"A. The only thing that was said is, 'Carl, what are you doing', when he just, he was just so shocked as he approached.

"Q. What did you—(interrupted)

"A. He never said a word.

"Q. What did you do?

"A. I just, we, both of us, just, we didn't have time, he fired twice and the third one, I was aware that he just wavered like that (indicating), and he said, 'Hilda, run', either he said, 'Hilda, run', or I think he said, 'Hilda, run', but it went high, the third shot went real high. The first two was just like, the first two shots were just like the slamming of a door just falling to, and the second one, I was just aware of like that (indicating by using hands), as he moved it, and I was just scared; and that's when, that same moment, that he said, 'Hilda, run', and that high sound and something flew, I don't know if it hit that little wooden thing up and down the screen, something flew kinda at me, and it made a high shrill sound after the two loud ones; and I just paniced, and I think it was his voice that keyed me off; and I just started running fast as I could go around the bend of the house and got in the car, and I couldn't get it started for awhile, and I never looked at him again."

She then drove to the first farmhouse for help. Defendant contends deceased was drinking, while Mrs. Buchanan, the sister-in-law, first denied it; but finally admitted he had one drink after arriving at defendant's place. There was found a pint of whiskey in decedent's car with a small portion gone.

■■■■ The defendant and the deceased's wife were the only two witnesses. Defendant's testimony attempted to establish a defense based on self-defense; while deceased's wife attempted to show without provocation. This conflict created a question for the jury and we feel the trial court was thoroughly justified in permitting the jury to decide the question. This Court has consistently held as it did in Maxwell v. State, Okl.Cr., 360 P.2d 959:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, Court of Criminal Appeals will not interfere with the verdict even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts."

Also, see, Blanton v. State, Okl.Cr., 357 P.2d 243; Goodson v. State, Okl.Cr., 354 P.2d 472; Nelson v. State, Okl.Cr., 355 P.2d 413.

The jury heard the testimony and had an opportunity to observe the witnesses and judge their credibility. This Court has many times refused to weigh the evidence and assume the responsibility of the jury.

See, Cowling v. State, Okl.Cr., 327 P.2d 500; Hatfield v. State, Okl.Cr., 325 P.2d 972.

■ Defendant next complains that the trial court erred in giving Instructions number 5 and 11. Instruction number 5 reads as follows:

"You are instructed that the evidence in this case fails to show or tend to show excusable homicide, and therefore that degree of homicide will not be defined to you in these instructions."

The evidence reveals that the trial judge was correct in his declaration of law. The Statute defines excusable homicide in the following manner:

Title 21 O.S.A. § 731:

"Homicide is excusable in the following cases:

"1. When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent.

"2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner. R.L.1910, § 2332."

The testimony is wholly void of any testimony bringing this case within "excusable homicide". It may be that in absence of a definition of excusable homicide, a declaration that the evidence does not support the charge tends to confuse the jury as to excusable and justifiable homicide. Defendant's defense was justifiable homicide and the judge's declaration of law was to the effect that the evidence would not support a finding as to excusable homicide. The better practice would be not to give any instruction on excusable homicide where the evidence does not support such charge, especially where it is not defined. However, this Court has passed squarely upon the question in the case of Reed v. State, 2 Okl.Cr. 589, 103 P. 1042, a very similar instruction was given as follows:

"You are instructed, gentlemen, that under the evidence in this case there is no element of excusable or justifiable homicide."

In approving this instruction, the Court said:

"The error of the argument on behalf of the defendant is in making the general rule as to the respective functions of court and jury applicable equally to a case in which there is some substantial evidence to support the right asserted and a case in which there is an entire absence of evidence to establish such right. The plea of justification protects only those who are without fault. Under these facts it was proper for the court to so instruct the jury. Such an instruction was a declaration of the law, and not an invasion of the province of the jury to determine the facts. 'Where there is testimony which has any legal effect, it would be error in the court to determine the weight of it, or the fact which it did or did not ascertain; but whether evidence tends to prove anything pertinent to the issue is a question for the court.'"

Also see, Musgraves v. State, 48 Okl.Cr. 418, 292 P. 376; and Burton v. State, 16 Okl.Cr. 602, 185 P. 842.

■ Instruction number 11 appears to correctly state the law of self-defense. Defendant calls attention to negative excerpts which he contends were prejudicial to the defendant. A review of the instruction in its entirety precludes the Court from attaching any significance to defendant's contention. However, there is another reason for holding adversely to defendant's argument. The record does not reflect that defendant made any objection to any part of the instructions. Nor did he offer any additional instructions. This Court has held in cases too numerous to mention that where no objection is made to instructions and no request made for additional instructions,

error will be considered waived, unless fundamental.

 We have carefully examined the instructions as to defendant's theory of defense, which was self-defense, and find therein the law clearly explained. Instruction number 6 sets forth the statutory definition; number 9 defines the elements of apprehension by a defendant of a design on the part of deceased to take defendant's life or do him great bodily injury; number 10 informs the jury that it is not necessary that the immediate peril which defendant fears be in fact true, but that he reasonably believes such to be the case; number 12 directs the jury to view the circumstances upon which defendant acted from the standpoint of said defendant.

It is the opinion of this Court that the instructions in their entirety adequately states the law applicable to the evidence adduced at the trial.

Therefore, based on the reasons set forth above, the judgment and sentence of the trial court is hereby affirmed.

JOHNSON, P. J., and BUSSEY, J., concur.