Clayton Leroy TAYLOR, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–57.

Court of Criminal Appeals of Oklahoma.

June 19, 1975.

Leslie R. Earl, Public Defender, Allen M. Smallwood, Legal Intern, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

PER CURIAM:

Appellant, Clayton Leroy Taylor, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–74–1020, for the offense of Sodomy, in violation of 21 O.S.1971, § 886. The jury recommended punishment of ten (10) years' imprisonment; punishment was fixed at five (5) years' imprisonment, followed by a five (5) year probationary term. From said judgment and sentence, a timely appeal has been perfected to this Court.

The State's first witness was the prosecutrix, Lori Ann Taylor, the alleged victim, and the daughter of the defendant. The prosecutrix, a twelve (12) year old girl, testified that prior to coming to Oklahoma with her father and his common-law wife, Faye Diehl, she had lived with her stepfather in Pennsylvania. In February of 1974, her real father, the defendant, and Faye Diehl came · to Pennsylvania and brought Lori, the prosecutrix, to Oklahoma. She testified that there were two younger children, ages three and four, in the household. The witness and her family resided at 1223 S. Elgin, in an apartment complex in Tulsa, Oklahoma.

On the date of the alleged incident, May 1, 1974, the prosecutrix testified that Mrs. Diehl had left the apartment with the complex manager, Carolyn Johnson. The two younger children, the prosecutrix, and her father remained in the house. She further testified that her father, who was in the bedroom, called her to him and asked her to sit on the edge of the bed. The defendant had the cover over him and the prosecutrix could not, at that time, determine to what extent the defendant was clothed. Her father, the defendant, told her to "suck on him." She refused to do as he requested, and he pulled back the covers, at which time the prosecutrix noticed that the defendant was nude. He forced her head down, inserting his penis in her mouth, holding her down until he ejaculated. She further testified that, as she was leaving the room, he threatened to kill her if she told anyone.

The prosecutrix testified that shortly thereafter Mrs. Diehl returned to the apartment, at which time nothing of the incident was mentioned. However, later that same evening, when the defendant asked for a beer, Mrs. Diehl and Lori went to the bar to get the defendant a beer. While the victim was out with Mrs. Diehl, she informed Mrs. Diehl of the incident.

The prosecutrix makes no mention of what time during the day this incident oc-

curred. She did testify that when Mrs. Diehl left, just before her father called her into the bedroom, Mrs. Diehl had said something about going to the store.

The prosecutrix testified that, sometime before the incident, one Bobby Mitchell had moved into their apartment. Mitchell, an ex-husband of Faye Diehl, had been living across the hall but because of a dispute with Joyce, with whom he had been living, he moved into the defendant's apartment.

The witness had told Carolyn Johnson, the apartment manager, of the incident and when the witness was relating the incident to the police on the afternnon of May 2, 1974, Carolyn Johnson again heard the story of the witness. According to Carolyn Johnson's testimony, the stories were substantially different. When counsel for the defendant asked the witness whether she had or had not told Carolyn Johnson a different story than the one she told the police, the witness testified that she had not told Carolyn Johnson a different story.

The State's next witness was James Nelson, who was incarcerated in the Tulsa County Jail with the defendant subsequent to his arrest in the instant case. The witness testified that he talked with the defendant at some length about the crime with which the defendant was charged. The witness stated that the defendant was explaining that there was a discrepancy as to whether the crime was to have actually taken place in the bedroom on the bed or on a chair in the living room. After stating the discrepancy, the witness testified that the defendant said, "Well, it was the chair." The witness then told the defendant that if the evidence was overwhelming that he didn't do it, there was nothing to be concerned about, to which the defendant replied, "Well, I did."

The witness, who at this time had four prior felony convictions, testified that he was very opposed to this type of crime. Because of his opposition, the witness approached several different officers of the court, relating to each the defendant's admission of the crime. The witness further

testified that no promises had been made in exchange for his testimony. He contends that he volunteered this information because he detested such crimes. Thereafter, the State rested its case.

The defense called as its first witness, Carolyn Johnson, the manager of the apartments in which the defendant and the prosecutrix were living at the time of the alleged offense. On May 1, the day in question, Carolyn Johnson's husband and the defendant were doing some painting at the Peoria Lounge, a bar at Fourth and Peoria. The witness took the defendant and her husband to the bar at about 9:00 A.M., so that they could begin painting. The prosecutrix, Lori, was babysitting for Faye Diehl's two children and Carolyn Johnson's three children. Lori kept the children in the Johnson's downstairs apartment. The witness and Faye Diehl spent the morning running errands, and about 1:15 P.M. they picked the defendant up from the Peoria Lounge and took him to the Top Hat, a bar just three or four blocks from the apartment complex where the parties herein resided. After dropping the defendant off, Faye and Carolyn went by the apartment to check on the children. Finding Lori and the five children as they had left them earlier that morning, the witness and Faye immediately left because the witness had to be somewhere else at 1:30 P.M. About 2:00 P.M., the witness and Faye arrived back at the Peoria Lounge and about twenty minutes later, the defendant arrived at the bar. He had taken a taxi from the Top Hat to the Peoria Lounge. From approximately 3:00 to 5:00 P.M. the defendant and Faye Diehl were together in the witness' car. After that, the witness and Faye and the defendant all returned to the apartment complex.

At about 6:25 P.M., the witness asked Faye to run another errand, at which time they were gone no more than ten (10) minutes, leaving the defendant with Lori and the two small children.

Later that evening at about 7:00 P.M., the witness sent one of her children up to

ask Faye Diehl to come down to her apartment. Faye went downstairs for about three minutes and then she went back upstairs to her own apartment.

In summarizing this part of the witness' testimony, there were three different times during which the actions of the defendant are unaccounted for: between 1:15 and 2:15 P.M., when the witness dropped him off at the Top Hat Bar; between 6:25 and 6:35 P.M., when he was alone in the apartment with Lori and the two small children; and, for about three (3) minutes somewhere around 7:00 P.M. on May 1, 1974.

The witness, Carolyn Johnson, testified that on the basis of what Lori told her, the incident was to have occurred during the three minutes that Faye was downstairs, at about 7:00 P.M. She further related that she was told by the victim, Lori, that the act occurred only once and that it was at the second time Faye came down, at 7:00 P.M. Also, as aforementioned, in direct contradiction to the testimony of Lori, the witness, Carolyn Johnson, stated that Lori had told her that the act occurred in the living room of the apartment in a chair, while defendant was fully clothed.

The witness further testified that Bobby Mitchell, the ex-husband of Faye Diehl, had helped to make the decision to call the police. According to the witness, after the police arrested the defendant, Bobby Mitchell and Faye Diehl "got back together." The witness also related that Bobby Mitchell made the statement that he was going to make a call to Pennsylvania and tell Joyce not to come back to Oklahoma, since he and Faye were going back together. According to the witness, Faye was present when Bobby Mitchell made that remark.

The defendant called as his next witness Marlene Kendrick. The witness had, on occasion, dealt with the victim, Lori Ann Taylor, while Lori was playing with the witness' children. On two separate occasions, the witness had ordered Lori to quit saying that she hated her father, or else leave the witness' home.

Lori, in her own testimony, directly contradicted the testimony of Marlene Kendrick, saying that she had never been reprimanded for saying that she hated her father.

The next witness for the defendant, Linda Foster, is the daughter of Marlene Kendrick. She testified that on April 29, 1974, the victim, Lori Ann Taylor, said that she, Lori, and Faye Diehl were trying to get rid of the defendant. The witness quoted Lori as saying they were, "Either going to leave him or think up a way to get rid of him." Also, in her own testimony, when questioned as to this remark, Lori Ann Taylor denied making this or any other similar statement.

The defendant next called Faye Diehl, having her declared as a hostile witness. The witness' testimony as to the events of May 1, 1974, were substantially the same as the event related by Carolyn Johnson; however, one substantial difference in the testimony of Faye Diehl and Carolyn Johnson exists as to the time of the alleged act. Carolyn Johnson very emphatically testified that Lori told her the act occurred the second time that Faye came downstairs, which was during the three minutes period around 7:00 P.M. However, Faye Diehl testified that Lori told her that the act occurred at 1:00 or 2:00 P.M. in the afternoon.

The witness testified that one of the reasons the defendant, Clayton Leroy Taylor, picked up Lori Ann Taylor in Pennsylvania from Mike Fleeson, her stepfather, was because Fleeson wanted to get Lori off his hands. Fleeson had had trouble with Lori because she lied to him and he was tired of it.

In relation to the remainder of the testimony of Faye Diehl, the testimony of Marjorie Short, who ran the Peoria Lounge, also called on behalf of the defense, must be considered. Marjorie Short testified that on May 1, 1974, the defendant was gone from the bar for about forty-five (45) minutes. During that time, Marjorie Short overheard a conversation

between Faye Diehl and Bobby Mitchell. The witness related that Faye and Bobby expressed their love for each other and decided that they would have to get rid of Clayton, the defendant.

In answer to that testimony, Faye Diehl contends that there was no such conversation with Bobby Mitchell. She did admit her desire to leave the defendant, but she stated that she had decided to leave the defendant before she knew that Bobby Mitchell was living in the same apartments. She also admitted being angry with the defendant, but stated that she was not scheming to get rid of him. She further testified that she had asked Bobby Mitchell to move out of her apartment after the defendant had been arrested, but that Mitchell refused to leave.

Faye Diehl testified that Bobby Mitchell had previously tried to get her to leave with him, but when the defendant found out he and Mitchell had words over the matter. However, Mitchell promised not to bring up the subject again and the matter seemed to be resolved.

The defendant brings this appeal on two assignments of error. The defendant contends, in his first assignment of error, that the evidence adduced at trial does not sustain a verdict of guilty beyond a reasonable doubt.

In *Warner* v. *State,* Okl.Cr., 489 P.2d 526 (1971), a sodomy case, this Court said:

"   .   .   .   We have consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts.   .   .   ."

■ In *Cole* v. *State,* 84 Okl.Cr. 76, 179 P.2d 176 (1947), this Court held that the same quantum of proof which is neces-

sary to sustain a conviction for rape will likewise be applied to a case of sodomy. In *Roberts* v. *State,* 31 Okl.Cr. 103, 237 P. 148 (1925), and *Blanton* v. *State,* Okl.Cr., 357 P.2d 243 (1960), this Court held that where the testimony of the prosecutrix is not contradictory, uncertain or improbable, and she has not been impeached, and where the testimony is positive and definite in its material parts, the conviction will not be set aside.

In the instant case, the evidence presented at trial by the prosecutrix is not contradictory, uncertain, or improbable. The prosecutrix testified as to one account and one account only. The evidence which is contradictory, as to the place of the act, whether it was in the bedroom on the bed or in the living room in the chair, was taken from testimonies of persons who claim to have been told such by the prosecutrix. However, when the prosecutrix was asked if she had told Carolyn Johnson that the act occurred in the living room, the prosecutrix denied any such statement. The credibility of the witness is not for this Court to determine. There is nothing in her testimony which is inherently improbable based on the entire circumstances of the case. As to the possible time in which the alleged act could have been committed, the prosecutrix, in her own testimony, said that when Faye Diehl was leaving, she said something about going to the store. And, in reviewing the evidence, Faye Diehl left with Carolyn Johnson at about 6:15 P.M. for ten minutes to go to the Warehouse Market. From this, and from the other testimony as to the defendant's nearness to the apartment between 1:15 and 2:15 P.M., it is possible that the act could have occurred at either time. Even though Faye Diehl was only downstairs for *about* three minutes about 7:00 P.M., we cannot wholly discount the possibility of the occurrence of the act at that time also.

■ In summary, the testimony as to the account of the alleged incident by the prosecutrix is, within itself, without contradiction. It leaves nothing but an availa-

ble time frame in which the act could have occurred.

Because of this Court's finding as to the effect of the prosecutrix' testimony, we deem it unnecessary to discuss the corroborating testimony of the State's witness, James Nelson. The corroborating testimony of Nelson would only be necessary had the testimony of the prosecutrix failed to meet the standards as required in *Roberts* and *Blanton,* supra.

■ Also, the allegations made by the defendant in relation to the conspiracy of the prosecutrix and Faye Diehl to rid themselves of the defendant, are irrelevant as to the sufficiency of the facts necessary to prove the alleged act. Whether or not there was a conspiracy, and if so, whether or not it was the basis of malicious prosecution, was a fact for the jury to decide.

Based on the above review of the defendant's first proposition, this Court, in light of previous decisions, reflected by *Warner,* supra, holds that the evidence in the instant case was competent and affords a reasonable basis for a verdict of guilt. The first proposition is without merit.

■ The defendant alleges as his second assignment of error that the district attorney, during the closing argument, offered arguments relating to the failure of the defendant to take the stand and testify in his own behalf, in violation of 21 O.S.1971, § 701.

The State, as set forth in the facts, *supra,* presented two witnesses: the prosecutrix, Lori Ann Taylor; and James Nelson, an inmate of the Tulsa County Jail. In his closing argument, the district attorney, in summarizing the evidence, said:

"  .   .   . You also heard her say that she didn't know exactly what time of the day that her father was there. I think, from all of the testimony we can best determine that it was sometime in the afternoon hours. You know, that's the testimony of the State's case. That's it, except for one thing, the in-direct. The indirect testimony of the defendant himself."

This Court held in *Gaddis* v. *State,* Okl.Cr., 447 P.2d 42 (1968), that the statute forbidding comment on the failure of the accused to take the stand does not prevent fair argument of the testimony. In the instant case, to hold that such a comment as was herein made was made in reference to the defendant's failure to testify would be to effectively bar the prosecution from reviewing the evidence presented at trial.

In *Denney* v. *State,* Okl.Cr., 346 P.2d 359 (1959), this Court held that it would not enlarge or extend the provisions of the statute prohibiting comment on the defendant's failure to testify, so as to prevent a fair discussion of the evidence.

To construe such a comment as the one in the instant case, as a comment in violation of 21 O.S.1971, § 701, would place an unfair burden on the prosecution. This Court finds that the defendant's second proposition is without merit, for the reason that the prosecutor's comment was obviously based on the testimony of James Nelson, who testified to the admissions made by the defendant to him while they were cellmates.

In conclusion, we observe that the record is free of any error which would justify modification or reversal. The judgment and sentence is, accordingly, affirmed.

BRETT, P. J., concurs in the result.